# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 19-1301V

| | |
|---|---|
| MARTHA BUCK, | Chief Special Master Corcoran |
| Petitioner, | Filed: August 23, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Catherine Elizabeth Stolar, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On August 27, 2019, Martha Buck filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received in her left deltoid on December 24, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that a preponderance of the evidence supports a finding that the onset of Petitioner's shoulder pain began within 48 hours of vaccine administration, and that Petitioner has satisfied the remaining requirements for entitlement.

## I.  Relevant Procedural History

Petitioner filed an affidavit and medical records on September 9 and October 30, 2019 (ECF Nos. 7, 9). The parties attempted settlement for several months in 2021, but on August 30, 2021, they requested that a deadline be set for Respondent to file his Rule 4(c) Report (ECF No. 23), and Respondent did so on October 14, 2021 (ECF No. 24). Following a status conference, Petitioner filed additional evidence and a statement of completion (ECF Nos. 25-27). On February 28, 2022, Respondent reported that his position remained unchanged despite Petitioner's additional evidence (ECF No. 28).

On May 13, 2022, Petitioner filed a motion for a ruling on the record (ECF No. 30). Respondent filed a response in opposition on July 27, 2022, and Petitioner replied on August 3, 2022 (ECF Nos. 33, 34). The issues of the onset of Petitioner's shoulder pain and entitlement to compensation are ripe for a ruling.

## II.  Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Relevant Factual History

This ruling contains only a brief overview of facts relating to the onset of Petitioner's symptoms and entitlement to compensation.

#### 1. Medical Records

On December 24, 2017, Petitioner received a flu vaccine intramuscularly in her left arm at Walmart. Ex. 1 at 1. Over three months later, on April 6, 2018, Petitioner presented to orthopedist Dr. Lisa Khoury complaining of left shoulder pain. Ex. 7 at 1. Petitioner reported that she had received a flu shot at Walmart on New Year's Eve,[4] and since then had difficulty raising her left arm. *Id.* She had pain that was ten out of ten at worst, but could be reduced to two out of ten. *Id.* Her shoulder was painful even at rest, and the pain was made worse by lifting or using the arm. *Id.* She had tried oral anti-inflammatories and exercises at home, without any improvement. *Id.*

---

[4] Respondent allows (and I agree) that the reference to New Year's Eve in the record appears to be in error, as Petitioner received the flu vaccine on Christmas Eve. Resp. at *3 n. 2.

4

On examination, Petitioner's left shoulder range of motion was reduced compared to her right shoulder in forward flexion and abduction. Ex. 7 at 2. She had pain throughout the arc of motion on the left side, and moderate tenderness to palpation. *Id.* X-rays were normal. *Id.* Dr. Khoury assessed Petitioner with strain of the muscles and tendons of the rotator cuff. *Id.* Dr. Khoury noted that Petitioner reported that the flu vaccine was injected in the subacromial area and that she had "left shoulder pain status post flu injection." *Id.* Dr. Khoury recommended an MRI and physical therapy ("PT"). *Id.*

On April 23, 2018, Petitioner underwent a left shoulder MRI. Ex. 3 at 4. The MRI revealed possible synovitis in the left shoulder, with edema along the synovial lining and a small effusion. *Id.* Petitioner also had osteoarthritis in her acromioclavicular joint. *Id.*

On May 7, 2018, Petitioner sought a second opinion from orthopedist Dr. Christopher Lutrzykowski. Ex. 2 at 7. She reported that her left shoulder pain started on December 24, 2017 when she was given a flu vaccine by a pharmacist. *Id.* She felt that the injection was given too high and went into the subacromial space rather than the deltoid muscle. *Id.* She felt "almost immediate onset pain after the injection and noted swelling as well." *Id.* The pain had continued through the winter and into the spring. *Id.* The pain was dull and achy, and generally mild (two out of ten) at rest. *Id.* However, when she moved or used the arm, the pain became more severe, at a level of six to ten out of ten. *Id.* She reported severely decreased range of motion and global weakness. *Id.*

On examination, Petitioner had mild tenderness at the edge of the acromion and greater tuberosity. Ex. 2 at 9. Dr. Lutrzykowski evaluated her range of motion (which was decreased), but was unable to test for impingement due to her limited range of motion. *Id.* He reviewed the MRI, noting minimal fluid in the subacromial bursa as well as glenohumeral joint effusion and synovitis. *Id.* Dr. Lutrzykowski assessed Petitioner with adhesive capsulitis that was "likely triggered by aberrant placement of influenza vaccine." *Id.* at 11. He referred her to PT and planned to administer an ultrasound guided glenohumeral injection if she did not improve. *Id.*

Petitioner reported for a PT evaluation for adhesive capsulitis on May 18, 2018. Ex. 3 at 15. The record notes that the onset of her problem was on December 24, 2017, when she got a flu vaccine at a pharmacy that was given high on her arm. *Id.* She had pain that lingered and worsened over time, and now had a frozen shoulder. *Id.* She reported pain levels ranging from two to ten out of ten. *Id.* On examination, her left upper arm had some atrophy, with a mild bulge at the distal anterior deltoid area. *Id.* Her objective findings were "consistent with a treatment diagnosis of L shoulder pain, adhesive capsulitis with significant muscle imbalances." *Id.* Petitioner continued PT until August 7, 2018. Ex. 6 at 5.

On August 20, 2018, Petitioner returned to Dr. Lutrzykowski for a follow up. Ex. 5 at 1. She had completed her PT sessions and was continuing to do home exercises, and reported an almost complete recovery. *Id.* She had improved strength, and was not

experiencing pain at night or at rest during the day. *Id.* Dr. Lutrzykowski assessed her with left shoulder adhesive capsulitis that was resolving, and noted that it was "[p]ossibly due to vaccine injection." *Id.* at 3. Petitioner was instructed to continue her home exercise program and take Tylenol as needed for pain. *Id.* Dr. Lutrzykowski and Petitioner discussed a steroid injection, but agreed it was not warranted in light of her excellent improvement with home exercises. *Id.*

### 2. Affidavits

Petitioner submitted two affidavits in support of her claim. Exs. 8, 12. Petitioner averred that she has received many injections in her life, and was prepared for her left shoulder to be painful for a couple of days after her flu shot. Ex. 8 at ¶ 2. She told the pharmacist that the injection site was much higher than normal, but he proceeded to inject it into her bursa rather than the deltoid. *Id.* Her shoulder began to hurt during the drive home. *Id.*

Within hours, the general tenderness in her arm developed into a more localized shoulder pain. Ex. 12 at ¶ 1. She called a longtime friend, Bob Lorez, at six o'clock that evening and complained of the escalating pain. *Id.* She took Tylenol and went to bed, but the next morning the pain was worse, and continued to increase over the next few days. *Id.* She recounts an episode on December 27, three days after vaccination, when she reached for a cup of tea during a phone call with Mr. Lorez and screamed from the pain. *Id.* She tried not to move her arm, but the movement from even walking was painful. *Id.* She hoped the pain would subside with time, and stayed home reading and writing, and limited her activities, taking Tylenol for pain relief. *Id.*

Petitioner lives in a rural area in Maine, where there are few doctors and it is difficult to get an appointment. Ex. 8 at ¶ 3. The nearest one she could find was over an hour away. Ex. 12 at ¶ 1. It took a long time to get an appointment, and then that appointment was cancelled due to snow, further delaying her care. *Id.*

Even car trips were painful, and she had to reach over with her right arm to open and close the door and fasten her seat belt. Ex. 12 at ¶ 2. Extending her left arm to dress, bathe, or brush hair was "impossible without screaming pain." *Id.* Sleeping was also very painful, and she was unable to find a position that was pain-free. *Id.* at ¶ 3. She had to shovel with one arm, and even doing that hurt her left arm. *Id.* She is a cancer survivor, and states, "the unrelenting pain in my shoulder was worse than the pain after the bilateral radical mastectomy," and the recovery was also worse because the damage was in the joint and not just the tissues. *Id.* at ¶ 4. She saw improvement only months later with physical therapy. *Id.* at ¶ 5. Attached to Petitioner's supplemental affidavits are phone records, but the affidavit does not explain these records.

### 3. Unsigned letter of Robert Lorez

Petitioner submits an unsigned letter from Robert Lorez as Exhibit 13. It was originally stricken from the record because it was labeled as a declaration, but was not signed under penalty of perjury and thus did not comply with 28 U.S.C. § 1746 (ECF No. 29). Petitioner was directed to re-file it. *Id.* On May 13, 2022, Petitioner re-filed the identical letter as Exhibit 13 (ECF No. 31-1). In her motion, Petitioner explains that Mr. Lorez is now deceased, and thus unavailable to attest under penalty of perjury. Mot. at *2 n. 1. Petitioner urges that I give as much weight to the letter as I deem appropriate under the circumstances. *Id.*

The unsigned letter from Mr. Lorez is not dated, but indicates at the top that it was received on May 16, 2019, although it does not state by whom. Ex. 13 It is not addressed to anyone. *Id.* It stated that Mr. Lorez and Petitioner had been close friends since the late 1960s, and they talked on the phone almost daily. Ex. 13. He recalled that she called him on Christmas Eve in 2017 to wish him and his family well. *Id.* She mentioned that she had finally gotten a flu shot, and that her arm hurt and was swelling. *Id.*

Rather than improving, her arm pain worsened. Ex. 13. He recalled that on December 27 while they were talking on the phone, she reached for a cup of tea and screamed into the phone from sudden and overwhelming pain. *Id.* He was shocked and his ears rang. *Id.* Petitioner apologized, and said that she expected the pain to go away soon since it was from a flu shot. *Id.* After a month, he convinced her that she should see a doctor. *Id.* She spent early February researching orthopedists. *Id.* It took weeks to get an appointment because of a doctor shortage in Maine, and then the doctor cancelled the appointment due to bad weather. *Id.* Because of this, she was not seen until early April. *Id.*

### 4. Social Media Posts

Petitioner submitted three Facebook posts under the name Mara Buck[5] in support of her claim. Exs. 9, 10, 11. In a post dated January 23, 2018, Petitioner states, "[a]rm still sore from flu shot couple weeks ago. Too tired to accomplish more than one tiny thing per day." Ex. 9 at 1.

In a second post, dated February 22, 2018, Petitioner states "[a]m I the only one whose arm still hurts a whole damn lot 2 months after the flu shot?" Ex. 10 at 1. In the comments, Petitioner states that there was an immediate large lump, which had receded somewhat, but that she still could not raise her arm higher than horizontal without a great deal of pain. *Id.* She states that she did not have a doctor but may need to find one. *Id.* In another comment, she stated that it was "probably doctor time and then possibly join a

---

[5] Although this is not explained, I assume for purposes of this ruling that Mara is a nickname for Martha, and thus that they are Petitioner's posts. I do not place significant weight on these in any event; their primary value is that they corroborate other record evidence.

class-action suit." *Id*. She also states that she "[t]ried to make a doctor's appointment yesterday" but was unable to do so. *Id*. at 2. She stated that she was "making an orthopedist appointment next week." *Id*. at 8. She added that there is "a special court to deal with 'no-fault' suits over such injuries." *Id*.

The third Facebook post is dated March 13, 2018. Ex. 11 at 1. It states that Petitioner had been waiting to see a doctor for over two months, and "Maine is closed today for storm, so another 3 weeks for new appt." *Id*. Petitioner commented that she had "an orthopedic appointment for today and now the whole state is closed because of the storm. Next appointment is April 6th!". *Id*. Attached to this post is an appointment card overlaid on an envelope mailed from Mid Coast Medical Group, Orthopedics, in Brunswick, Maine with a postmark of February 27, 2018. *Id*. at 3. The appointment card lists an appointment on March 13, 2018 at 9am. *Id*.

### C. The Parties' Arguments

Petitioner argues that the medical records consistently placed the onset of her shoulder pain within 48 hours of her December 24, 2017 flu vaccine. Petitioner's Motion for a Ruling on the Record, filed May 13, 2022, at *7 ("Mot."). Petitioner cites her first care for her shoulder on April 6, 2018, when she reported that she had a flu shot and since then had difficulty raising her arm. *Id*. When she saw another orthopedist for a second opinion on May 7, 2018, she reported that her shoulder pain started on December 24, 2017 when she was given a flu vaccine. *Id*. He doctor diagnosed her with adhesive capsulitis, likely triggered by aberrant placement of a flu vaccine. *Id*. And at her physical therapy evaluation on May 18, 2018, she complained of left shoulder adhesive capsulitis and pain that began on December 24, 2017 after a flu vaccination that was very high on her arm. *Id*.

Petitioner further relies on her Facebook posts, arguing that they are contemporaneous records documenting her injury and noting the worsening over time. Mot. at *8 (*citing Duda v. Sec'y of Health and Human Servs.*, No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021)). Finally, Petitioner cites the Federal Circuit's decision in *James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374 (Fed. Cir. 2021) as indicating that affidavits can be both reliable and objective evidence. *Id*. at *9. Petitioner adds that the fact that she did not seek medical treatment for her shoulder pain for three months by itself "sheds no light as to *when* that shoulder pain first began." *Id*. at *6 (emphasis in original).

Respondent argues that Petitioner has not shown that the onset of her shoulder pain occurred within 48 hours of vaccination. Respondent's Response to Petitioner's Motion, filed July 27, 2022, at *7 (ECF No. 33) ("Resp."). Respondent does not dispute that Petitioner meets the remaining SIRVA criteria. *Id*. at n.5. Petitioner did not present to a medical provider until over three months after vaccination (although Respondent acknowledges that her appointment was initially scheduled for two weeks earlier). *Id*. In

Respondent's view, the delay is not dispositive, but is relevant, citing *Mueller v. Sec'y of Health and Human Servs.*, No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) ("[m]emories are generally better the closer in time to the occurrence reported"). Respondent asserts that Petitioner's reporting of immediate pain to her physician more than three months after vaccination "carries less weight because of the gap in time between the vaccination and her accounting." *Id.* at *8. Respondent similarly discounts Petitioner's Facebook posts because they were made 30 days or more after vaccination and therefore are "not as trustworthy as statements made closer in time to the alleged injury." *Id.*

Respondent urges particular caution with respect to Petitioner's February 22, 2018 Facebook post reporting immediate symptoms, because the comment "coincided with her declaration that she was 'comfort[ed]' by the existence of the Vaccine Injury Compensation Program and would 'possibly join a class-action suit.' " Resp. at *8. Respondent speculates, "Petitioner's comments may very well have been influenced by her desire to receive financial remuneration, either through the Vaccine Program or through private litigation." *Id.* Respondent cites *Duda*, 2021 WL 4735857, at *8, arguing that "[p]etitioner's report of 'immediate' pain during her first presentation to a physician regarding her shoulder occurred 'after she began to suspect she might have a claim in the Vaccine Program.' " and noting that judicial officers have long recognized that participation in litigation may impair the accuracy of a person's memory. *Id.*

Respondent argues that the "unreliable declaration of Mr. Lorez provides little support for petitioner's claim" in light of his significant personal relationship with Petitioner, in addition to the fact that it is unsworn. Resp. at *9. Finally, Respondent argues that Petitioner's affidavits do not constitute reliable, objective evidence of onset, citing *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (Fed. Cl. 1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"). *Id.*

Petitioner replies that she has credibly explained why it took three months to see a doctor, including that she lives in a rural area and her first scheduled appointment was cancelled by the physician due to inclement weather. Petitioner's Reply, filed Aug. 3, 2022, at *2 (ECF No. 34) ("Reply"). Respondent's suggestion that Petitioner's statements months after vaccination are inherently less reliable "does not take into account that for a 71-year-old woman living in a very rural part of Maine during the dead of winter, her shoulder injury was likely the most important thing in her life." *Id.* at *2-3. Petitioner also argues that Respondent's "musing that her Facebook posts should be looked at with 'caution' as petitioner may have posted that information with the hope of one day gaining 'financial remuneration' is nothing more than pure speculation." *Id.* at *3. Petitioner adds that affidavits from a petitioner and their friends and family members are routinely relied on in Vaccine Program cases, and should be in this case as well. *Id.* at *3-4.

9

### D. Factual Finding Regarding QAI Criteria for Table SIRVA

#### 1. Onset

After a review of the entire record, I find that it is more likely than not that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccine administration, specifically on the day of vaccination.

I base this finding primarily on the medical records. Petitioner consistently reported that her shoulder pain began on the date of vaccination, and related her pain to the flu vaccine. Exs. 2 at 7, 3 at 15, 7 at 1. The medical records are buttressed by consistent statements in affidavits and social media posts. Exs. 8-12.[6]

Petitioner did delay in reporting her injury somewhat, and Respondent accurately maintains that this has relevance to the onset question. But a delay in seeking care is not uncommon in SIRVA cases, and otherwise is not "dispositive of whether a petitioner's shoulder pain began within 48 hours." *A.P. v. Sec'y of Health & Human Servs.*, No. 17-784V, 2022 WL 275785, at *23 (Fed. Cl. Spec. Mstr. Jan. 31, 2022); s*ee also Winkle v. Sec'y of Health & Human Servs*., No. 20-485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021) ("[i]t is common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own" and finding that the onset of the petitioner's pain occurred within 48 hours of vaccination in spite of a five month delay in seeking treatment); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied*, 142 Fed. Cl. 329 (2019) ("that petitioner delayed seeking treatment for her shoulder symptoms does not negate the value of her treatment records or render this evidence not credible, although it may speak to the severity of her injury").

Rather, delay must be viewed in the context of the entire record, including medical records, affidavits, and other evidence. In this case, there is sufficient consistent evidence supporting a finding that the onset of Petitioner's pain was within 48 hours, and no contrary evidence. Petitioner has provided evidence explaining the delay, including the postponement of her care due to weather, unavailability of doctors, and hoping for improvement with time.

Respondent's suggestion that Petitioner's awareness of the possibility of compensation through the Vaccine Program discredits her affidavits or other statements about her injuries is not compelling. While I do not dismiss the possibility that a petitioner *could* be incentivized to exaggerate their injuries by the prospect of monetary gain, that

---

[6] The unsigned and undated letter from Mr. Lorez is consistent with medical records, affidavit, and other evidence, and thus provides corroboration, but I do not place substantial weight on it for the reasons previously mentioned.

does not mean that every petitioner who knows the Program exists is not credible. Here, Petitioner's reports to medical providers were consistent and were relied on in providing care, suggesting that her providers found her credible. *See Cucuras*, 993 F.2d at 1528 (medical records containing information supplied to health professionals to facilitate diagnosis and treatment are generally trustworthy evidence). Her medical records document objective evidence of a shoulder injury, and her condition improved with care.

After a thorough review of the record, I find that a preponderance of the evidence supports a finding that Petitioner's shoulder pain began on the day of vaccination, which is within 48 hours. Thus, this QAI criterion is satisfied.

### 2. Other SIRVA QAI Criteria

Respondent does not contest the remaining SIRVA QAI criteria, and I find that the record contains preponderant evidence that they are satisfied. Petitioner did not have a history of left arm pain or injury prior to December 24, 2017 flu vaccination that would explain her symptoms after vaccination. *See generally* Ex. 3. Her pain and reduced ROM were limited to her left shoulder, where the flu vaccine was administered, and no other condition or abnormality has been identified that would explain her post-vaccination symptoms. Exs. 2-7.

### E. Other Requirements for Entitlement

The record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 1. She experienced the residual effects of her condition for more than six months. Ex. 6 at 1. She averred that she has not previously collected an award or settlement of a civil action for damages, and there are no civil actions pending. Ex. 8 at ¶ 14.

## Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that the onset of Petitioner's shoulder pain occurred on the day of vaccination. I find that all other SIRVA Table requirements are met, as are other requirements for entitlement. Therefore, Petitioner's motion for a ruling on the record that she is entitled to compensation is **GRANTED**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
